UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT J. TURSKI,

               Plaintiff,                               Civil Action No. 11-cv-13462

       v.                                  District Judge George Caram Steeh
                                           Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

       Plaintiff Robert Turski brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 10, 13), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

## I. RECOMMENDATION

       For the reasons set forth below, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence and complies with the applicable rules and regulations. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

On May 5, 2006, Plaintiff filed an application for DIB asserting that he became unable to work on July 1, 2005. (Tr. 100.) The Commissioner initially denied Plaintiff's disability application on November 2, 2006. (Tr. 68.) Plaintiff then filed a request for a hearing, and on April 2, 2009, he appeared with counsel before Administrative Law Judge ("ALJ") Deborah Arnold, who considered the case *de novo*. (Tr. 40-66.) In a July 1, 2009 decision, ALJ Arnold found that Plaintiff was not disabled. (Tr. 9-30.) Her decision became the final decision of the Commissioner on June 17, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on August 9, 2011. (Dkt. 1.)

### B. Background

Plaintiff was 54 years old on the alleged disability onset date. (Tr. 100.) He previously worked as a Mold Maker, Foreman, and General Manager for a mold injection company until his lay-off in February of 2001.[1] (Tr. 44, 139.)

#### 1. *Plaintiff's Testimony at the Hearing Before the ALJ*

Plaintiff testified that sometime after July of 2005, he went to his doctor for "severe chest pains and real bad shortness of breath" and "problems with [his] rectum." (Tr. 44.) Plaintiff's doctor performed a stress test, and discovered that he had a "98 percent blockage in one of [his] arteries." (*Id.*) Plaintiff subsequently had bypass surgery. (Tr. 44-45.) He continued to suffer pain with regard to the "problems with [his] rectum" however. (Tr. 45.) Due to lack of insurance, those

---

[1] Due to this lay-off, Plaintiff's date last insured is December 31, 2006. (Tr. 43.)

2

problems were not addressed until May of 2006 when he had fistula[2] surgery.  (*Id.*)  Plaintiff testified that he still has problems sitting, but not due to the fistula; but, rather, due to back pain. (Tr. 45.) He also testified that he has problems with poor circulation in his legs.  (Tr. 47.)

Plaintiff testified that in his last job as a general manager at the mold-making company, he quoted jobs, ordered steel, talked "on the floor to the leaders" and to the customers, and hired and fired employees.  (Tr. 46.)  He testified that he sat down at his job about twenty to twenty-five percent of the time, but, otherwise, he was on his feet.  (*Id.*)  Prior to his bypass and fistula surgery, Plaintiff was an avid hunter and fisherman.  (*Id.*)  He has not engaged in those activities since.  (*Id.*)

Plaintiff testified that he currently experiences chest pain when he is "carrying something." (Tr. 49.)  He also testified that he can only walk fifteen minutes to a half an hour before his legs go numb due to continued deterioration in his condition since 2006.  (Tr. 50.)  In addition, he can only sit for twenty minutes to a half an hour before he has to get up due to his legs.  (Tr. 52.)

Plaintiff also testified that he suffers from anxiety and depression.  (Tr. 54.)  He cannot handle work related stress anymore.  (Tr. 58.)

### 2.  Medical Evidence

### a.  Medical Evidence From Before Plaintiff's Date Last Insured (December 31, 2006)

Plaintiff visited his treating physician, Dr. Chistel Tecarro of the MidMichigan Physicians Group, on November 7, 2005.  (Tr. 266.)  At that time, he complained of "on and off substernal chest pain that [had] been going on for the past 4 to 6 weeks now."  (*Id.*)  He also complained of

---

[2] "A fistula is an abnormal connection between an organ, vessel, or intestine and another structure.  Fistulas are usually the result of injury or surgery.  It can also result from infection or inflammation."   U.S. National Library of Medicine, NIH National Institutes of Health, www.hlm.hih.gov/medlineplus/ency/article/002365 (last checked 5/8/12).

"pain on defecation." (*Id*.)  Dr. Tecarro was primarily concerned with the chest pain and ordered a stress test. (*Id*.)

Subsequently, on November 16, 2005, Plaintiff was admitted to Bay Regional Medical Center for "unstable angina." (Tr. 187.)  Dr. Daniel T. Lee examined Plaintiff.  In his examination notes, he indicated that Dr. Tecarro called him and told him about Plaintiff's abnormal stress test that revealed a "stress induced ischemia." (Tr. 190.)  Dr. Lee also noted that Plaintiff was a smoker. (*Id*.)  On November 17, 2005, Plaintiff underwent coronary bypass surgery, performed by Dr. Ramesh Cherukuri. (Tr. 189, 191-94.)  The hospital discharged Plaintiff on November 21, 2005, indicating that he tolerated the surgery well. (*Id*.)

On December 1, 2005, Plaintiff saw Dr. Tecarro again and indicated that he had "been doing better" since the surgery. (Tr. 265.)  Dr. Tecarro noted that he "denie[d] having [any] recurrence of any chest pain.  No shortness of breath.  No palpitations noted." (*Id*.)

On December 15, 2005, Dr. Luigi Maresca of Michigan Cardio Vascular Institute examined Plaintiff. (Tr. 234.)  Dr. Maresca noted that "[t]he patient has been feeling well.  He is free from angina or shortness of breath." (*Id*.)   In addition, on December 24, 2005, Dr. Michael P. Bartlett reviewed x-rays of Plaintiff's heart. (Tr. 239.)  These x-rays showed some scarring from the surgery but "no acute abnormality." (*Id*.)

Plaintiff followed up regarding his rectal pain on February 10, 2006 when he underwent a colonoscopy. (Tr. 244.)  Plaintiff then proceeded to see Dr. Rafael Quinones of MidMichigan Physicians Group regarding his rectal pain on March 8, 2006, and  April 5, 2006. (Tr. 241-43.) Dr. Quinones noted, "[t]he patient still complains of significant pain, in which he can barely sit down on the left side." (*Id*.)  Dr. Quinones stated, "I strongly believe that this is a very complex fistula.

Most probably, this fistula has a high opening within the area of the rectum.  In which case, I have recommended this patient to be referred to Dr. Zainea, [a] colorectal surgeon specialist."  (*Id.*)

On April 27, 2006, Plaintiff saw Dr. Chistel T. Tecarro again and indicated that he was going to undergo surgery for his fistula.  (Tr. 263.)  In that appointment, Dr. Tecarro indicated that Plaintiff "denies having any chest heaviness, chest pain, shortness of breath, or palpitations."  (*Id.*)

On May 11, 2006, Plaintiff underwent an anal fistulotomy.  (Tr. 259.)  Dr. George G. Zainea of the MidMichigan Medical Center-Midland performed the surgery.  (*Id.*)

On August 26, 2006, Heidi L. Wale, M.S., LLP, performed a mental examination on Plaintiff on behalf of the state disability determination service.  (Tr. 281.)  With regard to Plaintiff's family background, she noted:

> The claimant had an older brother who died of a massive heart attack at age 44, he had an older sister who died of breast cancer when she was 38.  He has a younger brother who is still living and in his 40's who just had a stent put in his heart.  Both of the claimant's parents are deceased.  His mother died of Alzheimer's in her 70's.  He does not know how his father died, he never saw him as an adult.

(Tr. 282.)

With regard to his general health, Wale noted:

> The claimant reported that he had a beer the previous day.  He stated that he used to drink about six beers daily for about 20 years.  He stopped drinking so much after having bypass surgery.  He didn't think that his drinking has ever caused him a problem.  He denied ever trying any illegal drugs.  He used to smoke almost two packs of cigarettes daily but quit this also when he had bypass surgery.  He denied that he has ever had a gambling problem.

(Tr. 283.)

Plaintiff told Wales that on a typical day he gets up about 8:30 a.m. and monitors the stock market on his computer.  (*Id.*)  He lays down when he cannot sit anymore or gets tired.  (*Id.*)  He

5

takes a shower around 4:00 p.m. and eats dinner about 5:00 p.m. (*Id.*) Then he watches television

or reads the newspaper and goes to bed. (*Id.*)

With regard to mental health, Wales noted:

> The claimant emphatically stated that he is having problems with
> feeling hopeless. He admitted that when he was going through
> treatment for his fistula and hemorrhoids he contemplated suicide
> because he was in a lot of pain and was having difficulties obtaining
> medical care. He stated he was "at wits end." He denied ever
> engaging in any acts of self-harm or current suicidal ideations.

(Tr. 284.)

Wales diagnosed him with adjustment disorder with mixed anxiety and depressed mood. (Tr.

286.) She also stated he suffered from alcohol abuse that was in reported sustained remission. (*Id.*)

On September 16, 2006, Ron Marshall, Ph.D., performed a psychiatric review for the state

disability determination service. (Tr. 288-302.) He diagnosed Plaintiff with a non-severe affective

disorder. (Tr. 289.) He stated that Plaintiff suffered from adjustment disorder with mixed anxiety

and depressed mood. (Tr. 292.) He noted that Plaintiff's activities of daily living included: mowing

the lawn on a riding lawn mower, shopping, handling finances, monitoring the stock market,

computer games, "TV, fishing, [yard] work, bike riding, [and] visit[ing] others." (Tr. 301.) He

noted that Plaintiff had difficulty completing tasks, concentrating and getting along with others.

(*Id.*) However, he was able to follow instructions. (*Id.*)

On September 19, 2006, Dr. Daniel Dolanski also reviewed Plaintiff's file on behalf of the

state disability determination service. (Tr. 303.) He indicated that Plaintiff needed to "obtain a one

system exam" regarding his coronary artery disease. (*Id.*)

On October 14, 2006, Dr. Sujeeth R. Punnam performed a "one system" exam. (Tr. 310-13.)

She noted that, "[a]fter the bypass, his symptoms were better but he still has exertional chest

6

tightness, some exertional shortness of breath." (Tr. 310.) She performed an EKG that was normal. (Tr. 312.) Dr. Punnam's "Impression" was:

> 1. Coronary artery disease, status post bypass surgery.
>
> 2. Residual exertional angina and shortness of breath.
>
> 3. Right coronary artery occlusion by cardiac catherterization, but not bypass during the bypass surgery, probably needing further intervention for that.
>
> 4. Back pain today . . . and elevated blood pressure, limiting us to perform any exercise stress test. Moreover, he had a lesion in the right coronary artery that needs to be addressed with these residual symptoms.
>
> 5. Rectal fistula surgery with residual pain now.
>
> 6. Depression from above medical conditions.

(Tr. 313.)

On October 26, 2006, Dr. Dolanski reviewed Dr. Punnam's exam notes and completed a Physical Residual Functional Capacity Assessment. (Tr. 318-27.) Dr. Dolanski indicated that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for a total of at least two hours in an eight hour workday, sit for a total of six hours in an eight hour workday and perform unlimited pushing or pulling. (Tr. 320.) He recommended a "maximum of [four hours] stand/walk in an [eight hour] workday." (*Id.*) He also noted that Plaintiff needed to avoid exposure to extreme cold, heat, humidity and hazards. (Tr. 323.) His last note indicated that Plaintiff "[s]till ha[d] pain from rectal fistula surgery . . . . and lesion on [right] coronary artery [that had] not been addressed." (Tr. 326.)

Plaintiff started treatment at Community Mental Health for Central Michigan on November 30, 2006. (Tr. 328-39.) Patricia Alberda, ACSW, LMSW, completed Plaintiff's intake form. (Tr.

338.)  Plaintiff complained of depression and anxiety.  (Tr. 328-29.)  Alberda noted that his

presenting problems included anxiety, depression, panic, adjustment disorder, inattention, and

suicidal ideation. (Tr. 330-31.)  Alberda noted that Plaintiff's suicide risk factors included: feelings

of hopelessness, chronic pain/illness/disability, and suicide by relatives/significant others.[3]  (Tr.

332.) Alberda assigned Plaintiff a Global Assessment of Functioning (GAF) score of 45.[4]

    Plaintiff had an appointment with his primary treating physician, Dr. Tecarro, again, on

November 14, 2006.  (Tr. 359.)  The entirety of Dr. Tecarro's subjective analysis in her exam notes

reads as follows:

> Mr. Turski is a 55-year-old white male who came to the office today
> for follow-up of his coronary artery disease.  Apparently, this patient
> was trying to file for social security disability because, ever since he
> did have his bypass surgery and then it was followed up by his
> problem with his fistula, the patient was not really able to be
> gainfully employed because he cannot sit for prolonged periods of
> time nor can he really tolerate doing any kind of significant walking,
> running, or any exertion because he still gets a little bit short of
> breath every now and then.  From what we got the last time, there
> was no damage done to his heart; according to the patient, ever since
> he did have the bypass,  he was still having shortness of breath on
> exertion as well as some occasional chest pain.  He thought initially
> that social security was going to do a stress test on him, but they did
> not do that and just reviewed his records and denied him from there.
> He is currently working with his lawyer to get things taken care of

_____

[3] Plaintiff's first wife committed suicide years after their divorce.  (Tr. 334.)

[4] A GAF score is a subjective determination that represents "the clinician's judgment of the
individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS, 30 (4th ed., Text Revision 2000).  It ranges from
100 (superior functioning)  to 1 (persistent danger of severely hurting self or others, persistent
inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of
death).  _Id_. at 32.
    A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession
rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school
functioning (e .g., no friends, unable to keep a job)."  _DSM-IV_ at 34.

right now.  Because it has been a year since he did have his last stress
testing done and from that time he had the two-vessel bypass, I think
it is time for us to recheck him again.

(Tr. 359.)

### b.  Medical Evidence From After Plaintiff's Date Last Insured (December 31, 2006)

#### i.  2007 Records

Plaintiff returned to see Dr. George G. Zainea on January 3, 2007.  (Tr. 341.)  He indicated

that he experienced "discomfort after bowel movements."  (*Id*.)  He also had "some issues with

continence" and "postdefecatory seepage."  (*Id*.)  Dr. Zainea gave Plaintiff several medications to

try,  and told him to "utilize one that he thinks works best for him."  (*Id*.)

Plaintiff returned to see Dr. Tecarro on May 14, 2007 for a follow-up for his coronary artery

disease.  (Tr. 360.)  Dr. Tecarro noted that, "[a]pparently, he is trying to go for a work application,

but the DOT physical that he was supposed to have done would not clear him up [sic] because of

several problems."  (*Id*.)   Dr. Tecarro went on to note Plaintiff's coronary artery disease,

hypertention, hypercholesterolemia, abdominal wall hernia, fatigue and weakness.  (*Id*.)  She again

suggested that Plaintiff get a stress-test.  (*Id*.)

Plaintiff saw Dr. Tecarro again on June 22, 2007 for "worsening pain on the lower

extremities."  (Tr. 361.)  Plaintiff denied having any back pain at this time.  (*Id*.)  Dr. Tecarro

suggested doing "an arterial Doppler study" to rule our "deep venous thrombosis."  (*Id*.)

Plaintiff saw Dr. Tecarro again on July 26, 2007 for "back pain as well as bilateral thigh

pain."  (Tr. 362.)  Dr. Tecarro noted that "[t]he arterial Doppler study done on him in Midland did

not really show any significant findings such as blockages in the lower extremities."  (*Id*.) Dr.

Tecarro's impression was that Plaintiff had "[l]ow back pain with radiculopathy most likely from

muscle spasm."  (*Id*.)

On October 4, 2007, Patricia Alberta completed a Mental Health Report for the Michigan Jobs Commission regarding Plaintiff. (Tr. 357-58.) She indicated that Plaintiff had a "short memory span" and "difficulty with focus." (Tr. 358.) She also indicated that Plaintiff had poor self esteem, problems responding to stress due to panic attacks. (*Id.*) She also noted that Plaintiff had a low tolerance for rejection, and would have difficulty "performing tasks accurately that require speed." (*Id.*)

Plaintiff returned to Dr. Tecarro on October 31, 2007 complaining of pain in his feet. (Tr. 363.) Dr. Tecarro suggested an x-ray of the right foot and ankle, and a possible podiatry referral. (*Id.*)

Plaintiff saw Dr. Stephen R. Pavlock of MidMichigan Medical Center regarding the pain in his feet on November 1, 2007. (Tr. 396.) Dr. Pavlock indicated that Plaintiff had "mild degenerative changes with a plantar calcaneal spur." (*Id.*) Plaintiff visited Midland Family Footcare on November 14, 2007 and November 26, 2007 for these issues. (Tr. 401.)

Plaintiff returned to Community Mental Health for Central Michigan on December 28, 2007, complaining of depression. (Tr. 370.) Ralph Kanaar, MSW, LMSW, QMRP, CMHP, performed his intake assessment. (Tr. 370-80.) At this time Kanaar diagnosed him with major depressive disorder, single episode severe. (Tr. 376.) He assigned him a GAF score of 45.

### ii. 2008 Records

Plaintiff started treatment with Kanaar on January 18, 2008, and continued that treatment on a consistent basis through November of 2008.  (Tr. 378-89, 410-21.)  One of Plaintiff's sons died at age thirty-three of a brain aneurysm on or about March 31, 2008.  (Tr. 383-84.)  On November 26, 2008, Kanaar completed a Medical Provider Assessment that indicated that "working would not be possible."  (Tr. 426.)

Plaintiff saw Dr. Gregory H. Parish of MidMichigan Health on May 14, 2008.  (Tr. 398.) Dr. Parish diagnosed Plaintiff with a "small plantar heel spur," a "bunion" and "minimal degenerative changes."  (*Id.*)

Plaintiff returned to Dr. Tecarro on May 13, 2008 again complaining of bilateral heel pain. (Tr. 364.)  Plaintiff told Dr. Tecarro that "Dr. Stemberg in Midland" gave him an injection in his right heel after his last appointment.  (*Id.*)  Dr. Tecarro referred him back to a podiatrist to "see if he would require another shot in both heels this time since he had been pain-free after the shot was given for approximately almost 6 months."  (*Id.*)  Plaintiff visited Midland Family Footcare on May 21, 2008, May 30, 2008, June 13, 2008, June 27, 2008, July 25, 2008 and August 1, 2008.  (Tr. 401-03.)

Plaintiff saw Dr. Timonthy Berka of MidMichigan Health on July 29, 2008 for bone imaging of his feet. (Tr. 395.) Dr. Berka indicated that Plaintiff suffered from plantar fasciatus and calcaneal spurring.  (*Id.*)

Dr. Tecarro completed a Medical Source Statement on October 19, 2008 indicating that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand for less than two hours in an eight-hour day, and sit for six hours in an eight hour day.  (Tr. 407.)  She stated that

11

these limitations were due to Plaintiff's bilateral foot pain, which had existed for the last six to eight

months.  (*Id.*)  She indicated that these limitations would disrupt "a regular job schedule with low

physical demands," and recommended less than 80 hours a month.  (*Id.*)

Plaintiff went to Flint Cardiovascular Consultants in December of 2008.  (Tr. 428-32.)

Plaintiff continued to get treatment for his feet in December of 2008.  (Tr. 434-35.)  Plaintiff saw

Dr. Daniel Lee of the Michigan Cardiovascular Institute on December 18, 2008. (Tr. 437.) Dr. Lee

noted that his functional capacity post bypass surgery was "unremarkable."  (*Id.*)

### iii.  2009 Records

Plaintiff continued to treat with the Flint Cardiovascular Consultants in 2009. (Tr. 448-56.)

He also continued to treat with Kanaar.  (Tr. 457-67.)

### 3.  Vocational Expert Testimony

Vocational Expert ("VE") Melody Henry testified at the hearing.  (Tr. 60, 99.)  The ALJ

asked the VE to assume a hypothetical individual with the following limitations:

> Could [occassionally lift] 20 pounds, [frequently] lift 10 pounds,
> stand or walk for a total of four hours in an eight-hour day, sit for six
> hours in an eight-hour day, never climb ladders, ropes or scaffolds.
> Occasionally climb ramps or stairs, balance, stoop, kneel, crouch and
> crawl.  Need to avoid concentrated exposure to temperature extremes,
> humidity or hazzards, such as unprotected heights.

(Tr. 62.)

The VE testified Plaintiff could not perform his previous positions as a foreman or general

manager as he performed them, but that he could perform these positions as they are "generally

performed in the national economy."  (Tr. 62.)  The VE testified that the hypothetical individual

would be able to alternate position every thirty minutes in these positions, but that there would be

an "excessive amount of time in both positions done at a computer."  (Tr. 62.) The VE stated that

the hypothetical individual could use a "computer table that could be raised" if he could not sit for the amount of time that is necessary to perform these positions.  (Tr. 62-3.)  The VE stated that the hypothetical individual would be precluded from these jobs if he could only "perform duties that didn't require a supervisor's responsibilities or confrontation and negotiations and interaction with others."  (Tr. 63.)

On questioning by Plaintiff's counsel, the VE testified that if the hypothetical individual was limited to standing only two hours in an eight hour day, he could perform as a general manager, but not as a foreman.  (Tr. 64.) Lastly, the VE testified that if the individual had marked mental limitations in dealing with work stress, he would be precluded from working as either a general manager or a foreman.  (Tr. 64-65.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

13

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from July 1, 2005, Plaintiff's alleged onset date, through December 31, 2006, Plaintiff's date last insured. (Tr. 19.) At step two, the ALJ found that Plaintiff had the following severe impairments: "coronary artery disease and a rectal fistula." (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 22.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

a reduced range of light work as defined in 20 C.F.R. § 404.1567(b). The claimant could perform occasional lifting of 20 pounds; frequent lifting of 10 pounds; standing or walking for a total of 4 hours in an 8-hour work day; sitting for 6 hours in an 8-hour work day, never

14

> climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; avoiding concentrated exposure to temperature extremes, humidity, or hazards, such as unprotected heights.

(Tr. 24.)  At step four, the ALJ found that Plaintiff could perform his past relevant work as it is generally performed in the national economy.  (Tr. 28-30.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of

15

choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff has presented five claims of error on appeal. (Dkt. 10, Pl.'s Mot. Summ. J. at 6-29.) In substance, however, these claims all stem from one issue: whether the ALJ properly considered post-DLI evidence. (*Id.*)

"Evidence relating to a time outside the insured period is only minimally probative" to the disability determination, but the Sixth Circuit has stated that it nonetheless "may be considered to the extent it illuminates a claimant's health before the expiration of his insured status." *Nagle v. Comm'r of Soc. Sec.*, No. 98-3984, 1999 U.S. App. LEXIS 23310, *4 (6th Cir. Sept. 21, 1999)

16

(citing *Siterlet v. Sec. of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1998); *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988)).

### 1. *Substantial Evidence Supports the ALJ's findings at Step Two*

Plaintiff argues that the ALJ should have categorized Plaintiff's depression, anxiety, back pain and foot pain as severe impairments. (Dkt. 10, Pl.'s Mot. Summ. J. at 6.) The Commissioner argues that the ALJ properly considered these impairments. (Dkt. 13, Def.'s Mot. Summ. J. at 10.)

First, the Court must determine the status of the claimant's health prior to the expiration of his insured period on December 31, 2006. *Nagle*, 1999 U.S. App. LEXIS 23310, *4. As indicated above, the record evidence mentions the following impairments prior to December 31, 2006: coronary artery disease, rectal fistula, adjustment disorder with mixed anxiety and depressed mood and back pain. (Tr. 187-94, 234, 239, 265-66, 241-59, 286, 288-302, 313, 328-34, 359.)

Next, the Court must determine whether these impairments or a combination of these impairments are severe. 20 C.F.R. § 404.1520(c). The ALJ correctly found Plaintiff's coronary artery disease and rectal fistula impairments to be severe. (Tr. 187-94, 239, 241-59.) The pre-DLI evidence of back pain consists of one brief note by Dr. Sujeeth R. Punnam, stating: "Back pain today . . . and elevated blood pressure, limiting us to perform any exercise stress test." (Tr. 313.) Moreover, there is no evidence of foot pain prior to the expiration of the date last insured. Therefore, the ALJ did not err in deciding not to include Plaintiff's back and foot pain as severe impairments.

The evidence of adjustment disorder with mixed anxiety and depressed mood consists of an examination and diagnosis by state disability examiner Heidi L. Wale, a psychiatric review by Ron Marshall, Ph.D. for the state disability determination service, and an intake form completed by

Patricia Alberda, ACSW, LMSW for Community Mental Health for Central Michigan. (Tr. 328-39.)

Notably, Dr. Marshall's review indicates that Plaintiff had difficulty completing tasks, concentrating, and getting along with others. (Tr. 301.) However, he did not indicate whether those difficulties were mild, moderate, marked or extreme. (*Id*.); *see* 20 § C.F.R. 404.1520a(d)(1). The ALJ analyzed these difficulties to determine severity. (Tr. 301.) With regard to social functioning, she stated that Plaintiff had a "mild limitation" when balancing Dr. Marshall's assessment against Plaintiff's actual social relationships. (Tr. 22.) Likewise, with regard to concentration, persistence or pace, the ALJ noted that Plaintiff  had a mild limitation when comparing Dr. Marshall's assessment with Plaintiff's activities of daily living, which include significant financial adeptness. (Tr. 22.)

Patricia Alberda assigned Plaintiff a GAF score of 45, which implies a "serious impairment" with regard to "occupational" functioning. *DSM-IV* at 34. However, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec*.,211 Fed. Appx. 411 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 2005 WL 1317040, at *6 n.5, 133 Fed. Appx. 684 (11th Cir. 2005); *see also* 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000). Moreover, even if the GAF score were endorsed for use, the ALJ explained why she did not give it weight: "The undersigned is not persuaded by the GAF score because the findings from [Plaintiff's] mental status examination and his ability to perform his activities of daily living show he was not so limited." (Tr. 21.) Substantial evidence supports this determination. More importantly, even if substantial evidence did not support this determination, since the ALJ identified other conditions as being severe, any failure on the part of

the ALJ to identify Plaintiff's mental impairments as severe is harmless so long as the ALJ considered the non-severe impairments at subsequent steps. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001). In other words, the ALJ already found in Plaintiff's favor at step two. *Id*. As such, the ALJ'S step two analysis should be affirmed.

### 2. *The ALJ Committed Harmless Error with Regard to the Treating Source Rule*

Plaintiff argues that the ALJ failed to give Plaintiff's treating physicians controlling weight. (Dkt. 10, Pl.'s Mot. Summ. J. at 15.) Specifically, Plaintiff argues that the ALJ failed to give controlling weight to Dr. Tecarro's October 18, 2008 opinion because she incorrectly stated that the opinion was based on Plaintiff's back pain. (*Id*. at 17.) He also argues that the ALJ incorrectly assessed Dr. Tecarro's 2006 examination note. (*Id*. at 18.) Plaintiff lastly argues that the ALJ failed to give proper weight to Plaintiff's therapist, Mr. Kanaar, even while admitting that therapists are not considered "acceptable medical source[s]." (*Id*. at 19.) Given this admission, the Commissioner does not address the record evidence from Mr. Kanaar. With regard to Dr. Tecarro, the Commissioner argues that the ALJ correctly determined that Dr. Tecarro's November 2006 examination note was not an opinion, but rather a restatement of Plaintiff's subjective reasons for applying for benefits. (Dkt. 13, Def.s' Mot. Summ. J. at 14.) The Commissioner does not address Tecarro's October 18, 2008 opinion. (*Id*.)

The treating-source rule generally requires an ALJ to give deference to the opinion of a claimant's treating source. In particular, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R.

§ 404.1527(d)(2)); S.S.R. 96-2p, 1996 WL 374188 (1996).  And where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, she must then consider the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source."  *Id.*; 20 C.F.R. § 404.1527.

In addition, the treating-source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating-source opinion.  *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record").  The purpose of this procedural requirement is two-fold:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *5.

As Plaintiff admits, Mr. Kanaar is not a doctor and, therefore, is not entitled to the benefits of the treating source rule.  20 C.F.R. § 404.1527.  Moreover, the ALJ considered and rejected Mr. Kanaar's opinion as too remote, and unsupported by "concomitant clinical findings."  (Tr. 21.)  This

20

complies with the relevant social security ruling.  S.S.R. 06-03p, 2006 WL 2329939 (S.S.A.)

With regard to Dr. Tecarro, and Dr. Tecarro's November 14, 2006 chart note specifically, the ALJ explicitly stated:

> The undersigned considered the several opinions submitted by the claimant's treating physician. In a November 14, 2006 chart note, the claimant's treating physician indicated that the claimant was not able to be gainfully employed.  By way of his representative, the claimant placed heavy weight on this notation.  However, the undersigned was not persuaded by it because the notation was the claimant's subjective reports and not a definitive opinion by his treating physician.  Further, this vocational conclusion is not supported by the clinical findings and the record as a whole.

(Tr. 23.)

Substantial evidence supports this assessment of Dr. Tecarro, and Dr. Tecarro's November 14, 2006 note.  (Tr. 359.)  As stated above, the entirety of Dr. Tecarro's subjective analysis in her November 14, 2006 exam note reads as follows:

> Mr. Turski is a 55-year-old white male who came to the office today for follow-up of his coronary artery disease.  *Apparently, this patient was trying to file for social security disability because, ever since he did have his bypass surgery and then it was followed up by his problem with his fistula, the patient was not really able to be gainfully employed because he cannot sit for prolonged periods of time nor can he really tolerate doing any kind of significant walking, running, or any exertion because he still gets a little bit short of breath every now and then.*  From what we got the last time, there was no damage done to his heart; according to the patient, ever since he did have the bypass,  he was still having shortness of breath on exertion as well as some occasional chest pain.  He thought initially that social security was going to do a stress test on him, but they did not do that and just reviewed his records and denied him from there.  He is currently working with his lawyer to get things taken care of right now.  Because it has been a year since he did have his last stress testing done and from that time he had the two-vessel bypass, I think it is time for us to recheck him again.

(Tr. 359 (emphasis added.))

21

The emphasized text indicates that Dr. Tecarro was recording Plaintiff's subjective complaints. First, she ties the statement that Plaintiff is "not really able to be gainfully employed" with Plaintiff's subjective complaints regarding not being able to "sit for prolonged periods of time" or do any "significant walking, running or . . . exertion." (*Id*.) She never indicates that Plaintiff's coronary artery disease or rectal fistula, and/or any objective tests regarding these two impairments, prevent Plaintiff from sitting, walking, running or exerting himself. (*Id*.) Second, she begins her exam note regarding Plaintiff's ability to be employed with the word "[a]pparently." (*Id*.) This clearly does not indicate to this Court, or any reader, that Dr. Tecarro is tying her statement to objective medical data. (*Id*.) The Sixth Circuit has made clear that a treating physician's opinion may not be entitled to deference where it is "based on [plaintiff's] subjective complaints, rather than objective medical data." *Poe v. Comm'r of Soc. Sec*., 342 Fed. Appx. 149, 2009 WL 2514058, at *7 (6th Cir. 2009). As such, the ALJ's reasons for not giving this statement controlling weight is supported by substantial evidence.

With regard to Dr. Tecarro's 2008 opinion regarding Plaintiff's limitations the ALJ states:

> The undersigned placed little weight on [this] opinion because it was submitted almost two years after the date last insured, and it was primarily based on the claimant's back pains. The medical evidence does not reflect significant back problems prior to the date last insured. Further the opinion is inconsistent with the [claimant's] October 2008 stress test; his December 2008 2-D echochardiogram; and his cardiologists's opinion [that] indicated that the claimant's "functional capacity is really unremarkable."

(Tr. 28.)

Plaintiff is correct in pointing out that Dr. Tecarro's 2008 opinion was not based on Plaintiff's back pains. (Dkt. 10, Pl.'s Mot. Summ. J. at 17.) Dr. Tecarro specifically indicated Plaintiff's diagnosis as: 1) coronary artery disease; 2) Hypertension; 3) Hypercholesterolemia; 4)

22

Anal Fistula and 5) Bilateral foot pain. (Tr. 407.) However, the ALJ is correct about the timing of this opinion. (Tr. 28.) Dr. Tecarro formed this opinion almost two years after the Plaintiff's DLI. (Tr. 407.)

The case law and regulations are clear that not only must a severe impairment exist prior to the DLI for the Plaintiff to be eligible for benefits, the impairment must also be disabling prior to the DLI. "[E]vidence of a claimant's post-DLI condition, to the extent that it relates back, is relevant only if it is reflective of a claimant's *limitations* prior to the date last insured, rather than merely his impairments or condition prior to that date." *Lancaster v. Comm'r Soc. Sec.*, No. 1:07-cv-0044, 2009 U.S. Dist. LEXIS 55343, at *33 (M.D. Tenn. June 29, 2009) (citing 20 C.F.R. 416.945(a)(1); *Higgs*, 880 F.2d at 863). To that end, Dr. Tecarro's 2008 opinion is of questionable relevancy to Plaintiff's residual functional capacity prior to December 31, 2006. Dr. Tecarro is addressing Plaintiff's limitations as of October 19, 2008. (Tr. 407.) Thus, it is not reflective of Plaintiff's limitations on December 31, 2006. This fact renders the ALJ's incorrect assumption that back pain was the basis of Dr. Tecarro's opinion harmless because the remoteness of the opinion is a "good reason" for not giving it controlling weight.

### 3. Substantial Evidence Supports The ALJ's Residual Functional Capacity Assessment

Plaintiff next argues that the ALJ's RFC assessment of light work with restrictions did not adequately account for Plaintiff's continuing coronary artery disease. (Dkt. 10, Pl.'s Mot. Summ. J. at 20.) Likewise, Plaintiff argues that the ALJ's RFC failed to address the combined effect of Plaintiff's impairments. (*Id*. at 12-15, 28.) The Commissioner counters that substantial evidence supports the ALJ's RFC assessment of Plaintiff as of December 31, 2006. (Dkt. 13, Def.'s Mot. Summ. J. at 12.)

23

First, as the Court indicated above, substantial evidence illustrates that Plaintiff had the following severe impairments prior to December 31, 2006: coronary artery disease and rectal fistula. (Tr. 187-94, 239, 241-59, 265-66.)   However, in assessing an individual's residual functional capacity, the ALJ must address *all* the Plaintiff's impairments as of December 31, 2006 – not just his *severe* impairments.   *See Mariarz v. Secretary of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).   Thus, the question is whether the ALJ's RFC accounted for limitations resulting from all the evidenced impairments as of December 31, 2006: coronary artery disease, rectal fistula, and adjustment disorder.[5]

Substantial evidence as of December 1, 2005, illustrates that Plaintiff was "doing better" with regard to his coronary artery disease.   (Tr. 265.)   Indeed, he denied "[any] recurrence of any chest pain . . . shortness of breath . . . [or] palpitations . . .." (Tr. 265.)   Moreover, two weeks later, Plaintiff reported  feeling well, and being "free from angina or shortness of breath."  (Tr. 234)   In addition, on December 24, 2005, x-rays showed some scarring from the surgery but "no acute abnormality."  (Tr. 239.)   Moreover, evidence from an October 14, 2006 exam performed by Dr. Sujeeth R. Punnam noted some "exertional chest tightness, some exertional shortness of breath." (Tr. 310.)   However, Plaintiff's EKG  was normal.  (Tr. 312.)

Substantial evidence from January 3, 2007 also illustrates that Plaintiff had "some issues with continence" and "postdefecatory seepage" with regard to his rectal fistula, but no physical limitations due to these issues. (Tr. 341.)

Moreover, the only medical assessment of Plaintiff's actual physical limitations on or around

---

[5] The Court acknowledges that back pain was mentioned once before December 31, 2006, but this reference with regard to performing an exercise stress test is not enough to label it an impairment as of December 31, 2006.

December 31, 2006, came from state disability doctor, Dr. Daniel Dolanksi, on October 26, 2006. (Tr. 318-27.) Dr. Dolanski indicated that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for a total of at least two hours in an eight hour workday, sit for a total of six hours in an eight hour workday and perform unlimited pushing or pulling. (Tr. 320.) Dr. Dolanski noted that he recommended a "maximum of [four hours] stand/walk in an [eight hour] workday." (*Id.*) He also noted that Plaintiff needed to avoid exposure to extreme cold, heat, humidity and hazards. (Tr. 323.) He also indicated that he considered Plaintiff's continuing issues from his rectal and bypass surgery in assessing these limitations. (Tr. 326.)

Thus, with regard to the medical evidence, nothing suggests that as of December 31, 2006 Plaintiff had physical limitations not encompassed by the ALJ's RFC assessment. (Tr. 24.) The ALJ's RFC stated that Plaintiff could perform a reduced range of light work with:

> occasional lifting of 20 pounds; frequent lifting of 10 pounds; standing or walking for a total of 4 hours in an 8 hour day; siting for 6 hours in an 8 hour day; never climbing ladders, ropes or scaffolds; occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling; avoiding exposure to temperature extremes, humidity, or hazards, such as unprotected heights.

(Tr. 24.) This mimics Dr. Dolanski's RFC. (*Compare* Tr. 24 *with* Tr. 320.) The ALJ's RFC is supported by substantial evidence with regard to Plaintiff's physical limitations.

The Plaintiff argues that the ALJ should have included Plaintiff's mental limitations in the RFC even if she determined at step two that they were not severe. As indicated above, the evidence of Plaintiff's mental limitations prior to December 31, 2006 consists of an examination and diagnosis by state disability examiner Heidi L. Wale, a psychiatric review by Ron Marshall, Ph.D. for the state disability determination service, and an intake form completed by Patricia Alberda, ACSW, LMSW for Community Mental Health for Central Michigan. (Tr. 328-39.) Dr. Marshall's

25

review indicates that Plaintiff had difficulty completing tasks, concentrating, and getting along with others.  (Tr. 301.) Patricia Alberda's intake form indicated Plaintiff had a GAF score of 45, which indicates a "serious impairment" with regard to "occupational" functioning.  *DSM-IV* at 34.

The ALJ assessed this evidence in determining Plaintiff's RFC.  (Tr. 21.)  Although the ALJ combined her RFC analysis with her step two analysis, she very clearly acknowledged the difference between the two:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.   The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing Impairments (SSR 96-8p).   Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 22.)

Looking at the ALJ's step two/RFC mental analysis, the ALJ adequately explains why she did not include any mental limitations in her assessment.  (Tr. 22.)   With regard to social functioning, the ALJ did not include any limitations in the RFC because she found more persuasive the evidence that Plaintiff was "able to maintain a long-term relationship with his significant other." (Tr. 22.)   Likewise, with regard to concentration, persistence or pace[6], the ALJ found more persuasive the evidence of Plaintiff's activities of daily living, which included significant financial adeptness, than the evidence of concentration problems.  (Tr. 22.)  And, with regard to Plaintiff's

---

[6] Notably, there is no indication that Plaintiff had "moderate" problems with concentration, persistence or pace.  (Tr. 299.)  Dr. Marshall did not categorize Plaintiff's problems with concentration, and the ALJ determined any such problems to be mild.  (Tr. 22, 299.)

GAF score of 45, the ALJ stated "the findings from [Plaintiff's] mental status examination and his ability to perform his activities of daily living show he was not so limited." (Tr. 21.)  Therefore, the ALJ's decision regarding Plaintiff's mental limitations is supported by substantial evidence in the record and must be affirmed.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (stating an ALJ's decision "must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion" (internal quotation marks omitted)).

Plaintiff argues that the ALJ should have looked at evidence from post-December 31, 2006, to assess his functioning before December 31, 2006.  Specifically, on October 4, 2007, Patricia Alberta indicated that Plaintiff had a "short memory span," "difficulty with focus," poor self esteem, problems responding to stress due to panic attacks, a low tolerance for rejection, and would have difficulty "performing tasks accurately that require speed." (Tr. 358.)  In addition, as of November 26, 2008, Therapist Kanaar indicated that "working would not be possible" for Plaintiff.  (Tr. 426.)  However, the ALJ  adequately explained why she did not give this evidence weight: "The undersigned is not persuaded by those opinions as the opinions were not made during the period at issue and are not supported by the concomitant clinical findings." (Tr. 21.)  Indeed, Alberta's assessment came ten months after the DLI, and Kanaar's assessment came almost two years after the DLI.  (Tr. 358, 426.)

Thus, as indicated above, even if this Court would have included mental limitations in Plaintiff's RFC, the ALJ's decision not to include these limitations is supported by substantial evidence.  As such, this Court must affirm.  *Rogers*, 486 F.3d at 241.

**G.  Conclusion**

For the reasons set forth above, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence and complies with the applicable rules and regulations. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: May 17, 2012

28

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 17, 2012.

s/Jane Johnson
Deputy Clerk